IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Plaintiff,<br><br>v.<br><br>Filipe Jesus Mendoza-Sorzano<br>Defendant. | REPORT AND RECOMMENDATIONS<br><br>2:09-CR-00315-DAK |

Before the court is a Motion to Suppress submitted by Defendant, Filipe Jesus Mendoza-Sorzano. (File Entry #28.) After thorough review and consideration of the testimony and evidence presented at the evidentiary hearing, and the parties' pleadings, the court recommends that Defendant's Motion to Suppress be denied.

## FACTUAL BACKGROUND

Arizona Highway Patrolman Mark Gilberg has twenty-nine years of law enforcement experience and has conducted between 30,000 and 40,000 traffic stops. (Transcript of 1/11/2010, Evidentiary Hearing at 6, 8.) He estimates that between 100 and 200 of those stops have "resulted in a search revealing controlled substances, drugs." (Id. at 8.) Officer Gilberg has been trained in drug interdiction, with his most recent course provided through the Department of Justice in March 2009. (Id. at 6.)

On April 16, 2009, Gilberg patrolled highway U.S. 89A between Fredonia, Arizona, and Jacob Lake Inn. (Id. at 8-9.) Officer Gilberg has been certified since 1986 to operate a radar

unit, which he does "as a routine part of [his] duties." (Id. at 13.) On April 16th he verified that his radar was working by "[doing] a calibration check at the beginning of [his] shift." (Id.)

Around 10:35 a.m. that day, Gilberg's attention was drawn to a white Dodge Magnum station wagon, "the only vehicle on the road." (Id. at 10-11.) Based on visual estimation, Officer Gilberg concluded the car was speeding. (Id. at 11.) He activated his radar unit "and observed a reading on the radar unit of 86 miles per hour," which was 21 miles per hour over the posted speed limit. (Id. at 12.) Officer Gilberg activated his emergency lights and initiated a traffic stop on the speeding station wagon. (Id. at 17.) The vehicle came to a stop along a section of roadway that has no shoulder. (Id.) Gilberg approached the car on the passenger side. (Id.)

Upon reaching the car Officer Gilberg made several observations: the passenger-side window was rolled down; there were two occupants in the car and the passenger was asleep or pretending to be asleep; there were three or four cell phones in between the two seats of the vehicle; there was an open road atlas in the car and no luggage (Id. at 19-21.) and Officer Gilberg also detected the odor of air freshener coming from inside of the vehicle. (Id. at 22.)

Officer Gilberg asked the driver where he was headed and whether he was aware of the speed limit. (Id. at 22-23.) The driver, defendant Mendoza-Sorzano, spoke with broken English but was able to communicate with the officer. (Id. at 22, 31.) The defendant explained that he was traveling from Phoenix to Salt Lake City, where he planned to spend five days looking for employment as a construction worker. (Id. at 23.)

When asked for his license and registration, defendant handed the officer some type of Mexican ID card, written in Spanish, and a vehicle registration. (Id.) The name on the ID card was Pilar Sorzano, the photograph matched the defendant, and "in the lower right corner ... there was a stamp that said Sinaloa." (Id. at 23-24.) The vehicle paperwork showed the car had been

registered approximately two days earlier. (Id. at 24.)

Officer Gilberg advised defendant of the speeding violation before returning to his patrol car to run record checks. (Id. at 26.) He discovered that defendant had two "dummy" or "skeleton" files assigned to him: "file[s] that [are] created by [Motor Vehicle Department] to indicate ... that there has been a traffic violation by an individual who did not have a driver's license." (Id.) Notably, defendant's skeleton files listed different dates of birth. (Id.) The officer was unable to locate a valid license for defendant from any state. (Id. at 27.)

Officer Gilberg completed the paperwork and asked defendant to exit his vehicle. (Id. at 28.) Defendant joined the officer near the patrol car; Officer Gilberg explained to defendant the violations for speeding and lack of proper identification. (Id.) The officer talked further with the defendant about his travel plans. (Id. at 29.) The defendant stated that he was going to stay with his uncle in Salt Lake while he searched for work in construction as a framer. (Id. at 29-30.) Having many years of experience as a framer himself, Officer Gilberg asked to check defendant's hands; he felt for calluses but found none. (Id. at 30-31.)

Officer Gilberg arrested defendant for speeding and lack of proper identification. (Id. at 32-33.) The officer handcuffed and searched defendant before placing him in the patrol car. (Id. at 32.) Officer Gilberg requested Officer Cutchen respond to the scene to assist. (Id. at 33.)

Officer Gilberg had the passenger exit the car and wait some distance to the front. (Id.) He then requested a tow truck and began a vehicle inventory. (Id.) Officer Gilberg noticed that the passenger, who earlier seemed disinterested in the traffic stop, became keenly focused on the officer's vehicle inventory and spoke on his cellular phone the entire time. (Id. at 35.)

Officer Gilberg examined the vehicle's contents, starting with the rear cargo area. (Id.) There was no luggage except one small canvas bag containing a shirt and pair of jeans. (Id. at

36.) His attention was drawn to some type of hand-held drill with grinding wheels and a metal cutting blade as well as "a battery in the back with cables or electrical wires running forward," which he found extremely unusual. (Id.) He also noticed the vehicle's side panels in the cargo area "appeared to be loose like they had been taken off." (Id. at 37.)

Officer Cutchen, a certified Spanish translator, arrived to assist. (Id. at 37-38, 88, 91.) Defendant interrupted the vehicle inventory when he complained about discomfort from being handcuffed. (Id. at 38.) After consulting with Officer Cutchen, Officer Gilberg temporarily suspended the vehicle inventory and transported defendant to court, where he could be handcuffed more comfortably in front rather than behind his back. (Id. at 38-39.)

Officer Gilberg transported Defendant to the nearby Fredonia, Arizona, courthouse; while, as a courtesy, Officer Cutchen provided a ride to the passenger, who was not in custody. (Id. at 39.) In the meantime, the tow truck moved defendant's vehicle from the roadside to a tow yard in nearby Kanab, Utah, where it would be secure. (Id. at 40-41.) Officer Cutchen remained at the courthouse to assist with translation, while Officer Gilberg went to the tow yard to complete the inventory. (Id. at 41-42.) Officer Gilberg estimated that only twenty to thirty minutes elapsed between the time he left the vehicle at the scene and his arrival at the tow yard. (Id. at 42.) Defendant plead guilty to the traffic violations, received a fine, and was released from custody on his own recognizance. (Tr at 99 and 100.) Defendant then asked Officer Cutchen for a ride to his vehicle. Officer Cutchen then contacted Officer Gilberg, who advised Officer Cutchen to detain both the Defendant and the passenger of the vehicle because Officer Gilberg "felt he had found something, wasn't sure" in the vehicle. (Tr. At 100, 101.) Approximately fifteen minutes after being further detained, Officer Cutchen was contacted by officer Gilberg who advised Officer Cutchen to again place the Defendant and the passenger under arrest. (Tr.

102:2-5.)

Officer Gilberg requested assistance from Utah Highway Patrol K-9 Trooper Whitaker to aid him in completing the inventory. (Id. at 43-44.) Officer Whitaker responded and deployed his drug dog, though the dog did not alert on defendant's car. (Id. at 44.)

Officer Gilberg resumed the inventory, inspecting the engine compartment under the hood. (Id.) Near the firewall Officer Gilberg observed unusual scratch marks and paint overspray that did not appear to be from the manufacturer. (Id. at 44, 46.) He also noticed marks on some of the grommets located in front of the vent area. (Id. at 46.) Upon closer inspection, he observed some type of black plastic lid--clearly not an original part of the vehicle--wedged down inside of the vent that sits between the windshield and the top of the firewall. (Id. at 47-48.)

Officers loosened the grommets, reached in, and removed the plastic lid. (Id. at 48.) Concealed in the area beneath the black lid, officers discovered eight or nine "tubular shaped" packages wrapped in cellophane, tape, and grease. (Id.) The packages field tested positive for the presence of methamphetamine. (Id. at 49.)

Officer Gilbert then contacted Officer Cutchen and requested that he arrest the vehicle's occupants for possession of methamphetamine. (Id.) Officer Cutchen, who was still at the courthouse, placed both suspects under arrest. (Id. at 102-03.)

## ANALYSIS

I. **Officer Gilberg was not required to advise defendant of his *Miranda* rights.**

Defendant claims Officer Gilberg violated his rights as set forth in Miranda v. Arizona, 382 U.S. 436 (1966), by questioning him about his travel plans. During questioning, however,

Miranda was inapplicable.

Miranda "stands for the well-known proposition that a suspect in custody has a constitutional right under the Fifth Amendment to remain silent." United States v. Alexander, 447 F.3d 1290, 1294 (10th Cir. 2006). And, although Miranda provides for certain procedural safeguards regarding custodial interrogation, "two requirements must be met before Miranda is applicable; the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'" United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993).

With respect to the first requirement, "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)). The United States Supreme Court has stated plainly that "[t]he . . . noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda." Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (quotation in original).

As for the second requirement, "the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions . . . reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980) (footnotes eliminated). However,

> [I]t is beyond dispute that an officer may ask questions relating to the reason for the stop. Ordinarily, this also includes questions relating to the motorist's travel plans. Travel plans typically are related to the purpose of a traffic stop because the motorist is traveling at the time of the stop. For example, a motorist's travel history and travel plans may help explain, or put into context, why the motorist was weaving (if tired) or speeding (if there was an urgency to the travel).

United States v. Holt, 264 F.3d 1215, 1221 (10th Cir. 2001) (citations omitted).

When Officer Gilberg questioned defendant during the course of a routine traffic stop, defendant was not "in custody" for purposes of Miranda. Furthermore, questions asked about his employment and travel plans clearly did not constitute "interrogation," despite the fact that defendant might give responses that could suggest untruthfulness or create suspicion about his involvement in illegal activities. Defendant's claim that his rights under Miranda were violated by pre-arrest questioning is therefore not persuasive.[1]

### II. Officer Gilberg did not unlawfully exceed the scope of the traffic stop.

Defendant argues that "Officer Gilberg did not have reasonable suspicion to extend the traffic stop beyond the time necessary to effectuate the paperwork for the traffic violations and continue on with the arrest." Defendant relies on United States v. Lyons, noting "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver may become unlawful if it is prolonged beyond the time reasonably required to complete that mission." 510 F.3d 1225, 1236 (10th Cir. 2007) (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005)).

In addition to the initial speeding violation,[2] however, Officer Gilberg developed probable cause to believe that defendant lacked required personal identification and lacked a valid driver's license. Given the inability to confirm defendant's identity, Officer Gilberg elected to arrest the defendant.

Although he does not challenge the legality of his arrest, defendant nevertheless asserts

---

[1] Worth noting is the fact that, although defendant was questioned about his travel plans and employment, he was not questioned about--and made no admissions regarding--drug trafficking during the course of the traffic stop. And, when cross-examined at the hearing about whether defendant was in custody while being questioned, Officer Gilberg made clear that it was a non-custodial traffic stop and that he had defendant exit the vehicle for officer safety reasons. See Tr. at 60-61.

[2] Defendant concedes that Officer Gilberg's initial traffic stop for speeding was lawful.

his rights were violated by continued investigation.

Officer Gilberg had reasonable suspicion to believe defendant may be involved in drug trafficking. The law clearly establishes that a police officer may detain a driver for additional questioning unrelated to the original stop if the officer has an objectively reasonable and articulable suspicion of illegal activity. See e.g., United States v. Soto, 988 F.2d 1548, 1554 (10th Cir. 1993); cf. United States v. Walker, 933 F.2d 812, 817 (10th Cir. 1991).

In assessing whether Officer Gilberg could have formed a reasonable and articulable suspicion of criminal activity, the Court must base decisions not on any one factor, but on the "totality of the circumstances." United States v. Jones, 44 F.3d 860, 872 (10th Cir. 1995). In assessing reasonable suspicion, courts must also defer to trained law enforcement personnel and their "ability to distinguish between innocent and suspicious circumstances." United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997). Such deference is appropriate, because,

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same–and so are law enforcement officers. . . . [T]he evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement. Trained officers aware of the modes and patterns of operation of certain kinds of lawbreakers can draw inferences and make deductions that might well elude untrained persons.

Id. (citing United States v. Cortez, 449 U.S. 411, 418 (1981)). Therefore, "[t]he evaluation is made from the perspective of the reasonable officer, not the reasonable person." United States v. Quintana-Garcia, 343 F.3d 1266, 1270 (10th Cir. 2003) (emphasis original).

Based on the totality of the circumstances, Officer Gilberg had reasonable suspicion to believe defendant was engaged in criminal activity prior to asking additional questions about defendant's employment and travel plans or otherwise extending the scope of the stop:

**A. Masking odor.** The Tenth Circuit has consistently held that "a strong odor may give rise to reasonable suspicion on the part of law enforcement officials that the odor is being used to mask the smell of drugs." United States v. Salzano, 158 F.3d 1107, 1114 (10th Cir. 1998). And as Officer Gilberg testified, the odor of air freshener coming from defendant's vehicle was significant to him because he knows drug couriers routinely use air fresheners to mask the odor of drugs in vehicles. (Tr. at 22.)

**B. Implausible Travel Plans.** Defendant's vehicle contained inadequate luggage for a supposed two-person, five day trip to Salt Lake City. See United States v. Lopez-Gutierrez, 2006 WL 3373909 at *5 (D. Utah) (unpublished) (inadequate luggage for stated travel plans a factor in reasonable suspicion analysis); see also United States v. Contreras, 506 F.3d 1031, 1036 (10th Cir. 2007) ("We have noted numerous times that implausible travel plans can form a basis for reasonable suspicion." (citations omitted)).

**C. Recently Registered Vehicle.** Defendant, who claimed he was out of work and traveling to find employment, registered the vehicle just two days prior to the traffic stop. See United States v. Espinoza, 2007 WL 1018893 at *4 (D. Kan.) (unpublished) (evidence that "vehicle was registered to defendant just three days prior to the traffic stop, which is common for drug organizations seeking to present the driver as a legitimate owner of the vehicle" contributed to reasonable suspicion); see also United States v. Berrelleza, 90 Fed.Appx. 361, 364 (10th Cir. 2004) (unpublished) (recently registered vehicle a factor in finding reasonable suspicion).

**D. Multiple Cellular Telephones.** Though defendant's vehicle had only two occupants, Officer Gilberg observed three or four cellular phones in the car. See United States v. Jeter, 394 F.Supp.2d 1334, 1346 (D. Utah 2005) (two occupants but three cell phones contributed to reasonable suspicion); see also Lopez-Gutierrez, 2006 WL 3373909 at *5 (same).

**E. Deceptive answers.** Officer Gilberg reasonably doubted defendant's truthfulness. Defendant lacked proper identification and a records check revealed two skeleton files in which defendant provided different dates of birth. And, given his prior personal experience in the industry and no observable callouses, Officer Gilberg doubted defendant's claim of his occupation as a framer. See United States v. Wisniewski, 358 F.Supp.2d 1074, 1091 (D. Utah 2005), aff'd 192 Fed.Appx. 749 (10th Cir. 2006), (hands inconsistent with claims of construction employment adds to reasonable suspicion). Deceptive answers, when coupled with other suspicious behaviors, can give rise to reasonable suspicion. See, e.g., United States v. Carhee, 27 F.3d 1493, 1497-98 (10th Cir. 1994); United States v. Moore, 22 F.3d 241, 243 (10th Cir. 1994).

**F. Disclaimer.** Officer Gilberg took note of the crucifix, which he believed might be placed in the car as a "disclaimer" in hopes of relieving suspicions. (Tr. at 43.) The District of Utah has found that, while of questionable value when viewed in isolation, disclaimers may nevertheless be relevant in the reasonable suspicion inquiry. United States v. Ivey, 313 F.Supp.2d 1242, 1250-51 (D. Utah 2004).

In addition to the factors set forth above, Officer Gilberg testified he was aware, based on his training an experience, drug couriers often rely on a road atlas given unfamiliarity with their assigned routes and destinations. These facts also contributed to Officer Gilberg's suspicions and should be considered, in their totality, by the Court. See Wisniewski, 358 F.Supp.2d at 1091-92 (cellular phone and road atlas "reasonably contributed to some degree" to officer's reasonable suspicion because, rather than standing alone, "they were observed by a trained police officer in conjunction with a number of other suspicious factors."); see also United States v. Garcia, 52 F.Supp.2d 1239, 1252 (D. Kan. 1999) (noting that although factors such as travel from a known source city and presence of a cellular phone "add little to the reasonable suspicion calculus, they

are relevant facts to consider" in making a reasonable suspicion determination); United States v. Traxler, 477 F.3d 1243, 1247 (10th Cir. 2007) ("Even where a particular factor, considered in isolation, is of 'limited significance,' it nonetheless may affect the Fourth Amendment analysis when combined with other indicia of probable cause or reasonable suspicion.").

In weighing these factors, it is critical to note that reasonable suspicion is not a demanding standard. As plainly explained by the Tenth Circuit,

> A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct. Indeed, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard. Furthermore, reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. Thus, as long as he has a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is <u>not</u> involved in any illegality.

United States v. Johnson, 364 F.3d 1185, 1194 (10th Cir. 2004) (citations and quotations omitted) (emphasis in original). In making his assessment, Officer Gilberg was permitted "to draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person." United States v. Arvizu, 534 U.S. 266, 273 (2002).

Given the low standard presented by reasonable suspicion and the numerous factors present during defendant's traffic stop, Officer Gilberg clearly had reasonable suspicion to believe defendant may be involved in drug trafficking and was entitled to initiate an investigatory detention to confirm or dispel those suspicions. [The court should note that it was not persuaded by the officer's testimony that the factor that

defendant's identification card was from Sinaloa, an area the officer said was associated with dangerous drug trafficking cartels, should be taken into consideration. On cross-examination he admitted there could be "dozens" of similarly named locations (Tr at 55, 56. The officer's testimony was too vague on this point to be persuasive.]

###    III.    Officer Gilberg's search of defendant's vehicle was lawful.

Defendant argues that Officer Gilberg lacked authority to remove defendant's vehicle, that completion of the inventory search after it was temporarily suspended was improper, and that Office Gilberg exceeded the scope of the inventory search.

####    A. Officer Gilberg had authority to remove defendant's vehicle from the roadway.

Defendant asserts Officer Gilberg lacked authority to remove defendant's vehicle and relies on the Arizona Department of Public Safety's policy regarding vehicle removal. However, Section IV. (B)(1) of that policy expressly notes that officers may remove vehicles pursuant to Arizona Revised Statute Section 28-3511, which provides in subsection (A)(2) that "[a] peace officer <u>shall</u> cause the removal and either immobilization or impoundment of a vehicle if the peace officer determines that a person is driving while . . . [t]he person has not ever been issued a valid driver license or permit by this state and the person does not produce evidence of ever having a valid driver license or permit issued by another jurisdiction." (emphasis added).

Defendant's claim that Officer Gilberg lacked authority to impound his vehicle is therefore without merit.

####    B. Officer Gilberg's completion of the inventory search, which had been temporarily suspended, was authorized.

Defendant also suggests that Officer Gilberg acted improperly when he returned to complete the vehicle inventory at the impound yard, arguing that the purposes justifying a vehicle

inventory were extinguished immediately upon releasing the car to the tow truck. Defendant cites no case law supporting the notion that a vehicle inventory cannot be temporarily suspended; instead, he relies exclusively on the Department of Public Safety Policy directing that officers "shall inventory a vehicle prior to its removal."

In <u>United States v. Medina</u>, the District Court acknowledged certain restrictions on inventory searches:

> First, they are reasonable only if conducted according to standardized procedures. Second, the policy or practice governing inventory searches should be designed to produce an inventory; in other words, an inventory search must be justified by the administrative purposes of such searches. An inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence.

2004 WL 2634350 at *2 (D. Utah) (unpublished) (citations and quotations omitted). Nevertheless, the <u>Medina</u> Court, quoting the United States Supreme Court, simultaneously acknowledged the need for officer latitude in performing inventory searches:

> But in forbidding uncanalized discretion to police officers in conducting inventory searches, there is no reason to insist that the be conducted in a totally mechanical "all or nothing" fashion. Inventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger . . . The allowance of the exercise of judgment based on concerns related to the purposes of an inventory search does not violate the Fourth Amendment.

<u>Id.</u> (quoting <u>Florida v. Wells</u>, 495 U.S. 1, 4 (1990)) (internal citations and quotations omitted).

Officer Gilberg temporarily suspended the vehicle inventory in order to transport defendant to court. (Tr. at 38-39.) He promptly returned to the vehicle approximately twenty to thirty minutes after leaving it in the custody of the tow truck driver, who required roughly fifteen to twenty minutes to transport the vehicle from the scene to the tow yard in Kanab, Utah. Little time lapsed, then, if any, in which the tow truck driver would not have been driving and thus would have had an opportunity to rummage through defendant's vehicle. And there is no

evidence before the court suggesting that the tow truck driver was aware Officer Gilberg had not, in fact, completed his inventory search at the time he left the scene of the traffic stop.

Significantly, the reason for the temporary halt to the vehicle inventory was defendant's complaint of discomfort. (Id.) Realizing defendant had been handcuffed behind his back for some thirty to sixty minutes and likely was experiencing physical discomfort, Officer Gilberg responded by promptly transporting him to the courthouse--roughly five miles away. (Id.)

The Arizona Department of Public Safety policy governing vehicle removals sets forth standardized procedures for producing an inventory of the contents of impounded vehicles. Officer Gilberg acted reasonably both in temporarily suspending the inventory search and in resuming it to complete a proper inventory--a process instituted to protect both defendant and officer. The purposes of the inventory, including documenting defendant's property, were not extinguished by the brief halt in the process. Simply put, Officer Gilberg's reasonable "exercise of judgment based on concerns related to the purposes of an inventory search [did] not violate the Fourth Amendment." See Florida v. Wells, 495 U.S. 1, 4 (1990).

### C. Officer Gilberg had probable cause to search the area of defendant's vehicle where drugs were hidden

Finally, defendant argues that Officer Gilberg's search beneath the hood of defendant's vehicle, which lasted ten to twenty minutes, exceeded the scope of the inventory search and that all evidence subsequently obtained should be suppressed.

  i.  **Officer Gilberg's inspection of the engine compartment and vent area was within the scope of the vehicle inventory.**

As defendant notes in his memorandum, the Vehicle Removal Report used to complete an inventory search requires officers to check the condition of the engine and battery. Thus, defendant recognizes that Officer Gilberg properly inspected the engine compartment of the

vehicle. Although defendant asserts that Officer Gilberg violated policy and standard procedure by a more thorough examination of the area beneath the hood, he ignores Officer Gilberg's testimony that, upon lifting the hood, he observed unusual scratch marks and overspray that appeared to be different that the paint applied by the vehicle's manufacturer. (Tr. at 44, 46.) These unusual marks were past the mid-point of the engine, toward the firewall. (Id.) He also noticed some marks on grommets below the vent area, which is near the windshield wipers. (Id. at 46.)

Because the Vehicle Removal Report requires documentation of damage, Officer Gilberg's closer inspection of the area surrounding these unusual marks was properly within the scope of the inventory search. And, it was only upon closer examination of that area that Officer Gilberg discovered a black plastic Tupperware-type lid hidden within the vent. (Id. at 47-48.) Officer Gilberg immediately recognized that the lid was not an original part of the car and that there was likely contraband concealed inside the vent. (Id. at 48.)

After removing the plastic lid, Officer Gilberg discovered packages of methamphetamine concealed within the vent. (Id. at 48-49.) The drugs were thus discovered during the course of a proper inventory search of defendant's vehicle, and defendant's claim that Officer Gilberg exceeded the scope of the inventory search fails.

Even if the Court determines that Officer Gilberg exceeded the scope of the inventory, however, he had probable cause to believe that the vehicle contained contraband and therefore a thorough search of defendant's vehicle was constitutional.

    ii.    **Officer Gilberg had probable cause to believe defendant's vehicle contained contraband.**

A warrantless search of an automobile does not violate the Fourth Amendment if there is

probable cause to believe that the vehicle contains contraband, and officers may search the vehicle as thoroughly as a magistrate could authorize by warrant. United States v. Ross, 456 U.S. 798 (1982). The scope of such a search is "defined by the object of the search and the places in which there is probable cause to believe that it may be found." Id. at 824. As explained by the Tenth Circuit,

> Probable cause exists when under the totality of the circumstances there is a reasonable probability that a crime is being committed. The "totality of the circumstances" test does not depend on whether any particular factor is innocent when considered in isolation, but on whether, taken as a whole, the facts observed by law enforcement officers indicate a fair probability of criminal activity. Even where a particular factor, considered in isolation, is of "limited significance," it nonetheless may affect the Fourth Amendment analysis when combined with other indicia of probable cause or reasonable suspicion.

United States v. Traxler, 477 F.3d 1243, 1247 (10th Cir. 2007) (citations and quotations omitted).

In Jurado-Vallejo I, the Tenth Circuit clarified the inquiry where, as in the instant case, the officer suspects a vehicle contains a hidden compartment:

> Whether probable cause to search a vehicle can be based on evidence of a hidden compartment depends on two factors: (1) the probative value of the evidence—that is, the likelihood that there really is a hidden compartment; and (2) the likelihood that a vehicle with a hidden compartment would, in the circumstances, be secreting contraband.

United States v. Jurado-Vallejo, 380 F.3d 1235, 1238 (10th Cir. 2004). With respect to the second factor, the Court expressed the "common sense" observation that "it is hard to conceive of a legitimate use for a large hidden storage compartment in any vehicle." Id. Thus, the focus of the analysis is the likelihood, based on the officer's observations, that a hidden compartment exists in the vehicle.

And in Jurado-Villejo II, the Court reversed the District Court's granting of the motion to

suppress, noting that if the lower court found the officer's testimony credible, probable cause to search existed. United States v. Jurado-Villejo, 380 F.3d 1239, 1241 (10th Cir. 2004). The Court elaborated:

> The issue is not whether [the officer] could have done more to confirm that the vehicle had a hidden compartment. None of the opinions cited by the district court said that visual observations must always be corroborated by touch, smell, or the like. Probable cause exists when the evidence would warrant a person of reasonable caution to believe that evidence of a crime will be found at the place to be searched. [The officer]'s observations would warrant a reasonable believe that the vehicle contained a hidden compartment. And on the facts of this case, as we said before, if the vehicle had a hidden compartment, it was highly likely to contain contraband.

Id. at 1241-42 (internal quotations and citations omitted). The Circuit Court has further stated that "visual evidence of a hidden compartment, without more, may provide probable cause to conduct or expand a search." United States v. Ledesma, 447 F.3d 1307, 1317 (10th Cir. 2006) (citing United States v. Jurado-Vallejo, 380 F.3d 1239 (10th Cir. 2004)) (emphasis added).

Before he even left the scene of the traffic stop, Officer Gilberg reasonably believed the defendant's vehicle contained a hidden compartment. When he began the inventory, Officer Gilberg accessed the rear cargo area of the vehicle. (Tr. at 35-36.) He discovered some type of drill with grinding wheels and some type of "metal cutting blade on it." (Id. at 36.) Officer Gilberg also observed a battery in the rear cargo area with electrical wires running toward the front of the car, which he found "extremely unusual," as it was something he had never before seen in a vehicle. (Id. at 36-37.) Additionally, Officer Gilberg noticed that the interior panels of the cargo area "appeared to be loose like they had been taken off." (Id. at 37.) Officer Gilberg also took note of the passenger's behavior, as he shifted from seemingly disinterest in the traffic stop to keenly focusing on the officer's inventory search--and speaking on a cellular phone as he watched.

Having also taken note of numerous factors earlier in the stop making him suspicious of criminal activity, Officer Gilberg testified that what he observed in the cargo area of defendant's car caused him to really believe "at that time there was a secret compartment somewhere in the vehicle, that perhaps the battery [was] back there and that it was connected to some type of an electrode device, electrode magnetic device that would open a door somewhere for a hidden compartment." (Id.)

Officer Gilberg temporarily suspended his inventory in order to transport the defendant to court and then resumed the inventory some twenty to thirty minutes later. (Id. at 42.) As he returned to the car, Officer Gilberg "had tremendous suspicions" of criminal activity and believed, based on his observations, that drugs were likely hidden in the vehicle. (Id. at 43.) Although the assisting Trooper's drug-detecting dog failed to alert on the vehicle[3], Officer Gilberg took note of scratch marks and paint overspray observed under the vehicle's hood. (Id. at 44-46.) He found these marks unusual because they appeared in areas "where there normally wouldn't be tools used." (Id. at 45.) He also observed marks on grommets located near the vent located by the windshield wipers. (Id. at 46.)

Officer Gilberg testified that ten to twenty minutes elapsed from when he first lifted the vehicle hood until he discovered the black lid hidden in the vent area. (Id. at 71.) Part of the reason for the delay was that Officer Gilberg paused to search a computer program "that shows different vehicles where drugs have been located in secret compartments." (Id.) Officer Gilberg testified that, "[f]rom what I had seen, I was very sure that there was going to be a compartment with drugs in it. I looked through this -- in fact, there was a class that I had just attended. They

---

[3] The fact that the dog failed to alert on defendant's vehicle did not undercut the existence of probable cause. See United States v. Villegas, 2007 2220523 at *3, 6 (D. Utah) (unpublished).

issued this software to put in your laptops to help you know where hidden compartments are most common in certain types of vehicles, and that's what I was doing." (Id. at 72.

Officer Gilberg's conclusion was well-founded. In the cargo area, he observed a tool with grinding wheels and a metal cutting blade, a highly unusual battery placement with wires running to the front of the vehicle, and loose interior panels. When inspecting the engine compartment--at the front of the vehicle and in the direction of the wires leading from the battery--Officer Gilberg further noted scratch marks and paint overspray in unusual areas near the firewall as well as marks on grommets close to the windshield wiper vent. In short, these observations created a very high "likelihood that there really [was] a hidden compartment" in defendant's vehicle, see Jurado-Vallejo I, 380 F.3d at 1238, and "if the vehicle had a hidden compartment, it was highly likely to contain contraband." See Jurado-Villejo II, 380 F.3d at 1241-42.

Furthermore, although "visual evidence of a hidden compartment, without more, may provide probable cause to conduct or expand a search," see Ledesma, 447 F.3d at 1317, Officer Gilberg had much more than visual evidence to convince him drugs were hidden somewhere in the vehicle. During the traffic stop he noted a masking odor; implausible travel plans; a recently registered vehicle; multiple cellular phones; an atlas; a potential religious disclaimer; and a driver who had previously provided differing dates of birth to law enforcement. In their totality, the facts and observations in Officer Gilberg's investigation "indicate[d] a fair probability of criminal activity" and provided probable cause to believe defendant's vehicle contained drugs. See United States v. Traxler, 477 F.3d 1243, 1247 (10th Cir. 2007).

When he inspected the suspicious area of the engine compartment more carefully, Officer Gilberg observed a black plastic lid hidden inside a vent between the windshield and the hood.

(Tr. at 47.) Upon seeing the lid, Officer Gilberg "knew absolutely then that that was not a part of the vehicle, that there was some illegal activity. There was no question after that." (Id. at 48.) Officer Gilberg then accessed the vent compartment and removed the lid, which appeared to be placed there to hide the packages of illegal drugs found beneath it. (Id.) The numerous packages concealed in the vent compartment later tested positive for methamphetamine. (Id. at 49.)

## RECOMMENDATION

Based on the foregoing analysis, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress evidence seized during the search of Defendant's vehicle (File Entry #28) be DENIED.

Copies of the foregoing report and recommendation are being mailed to the parties who are hereby noticed of their right to object to the same. The parties are further notified that they must file any objections to the report and recommendation, with the clerk of the district court, pursuant to 28 U.S.C. Section 636(b), within ten (10) days after receiving it. Failure to file objections to both factual and legal findings may constitute a waiver of those objections on subsequent appellant review.

DATED this 3 day of May of 2010.

BY THE COURT:

**ROBERT T. BRAITHWAITE**

**U.S. Magistrate Judge**